UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARWAN ABDULKAREEM HAMDAN,<br><br>Defendant. | 4:23-CR-40041-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Marwan Abdulkareem Hamdan is charged with one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. 922(g)(1) and 924(a)(8). Docket No. 1 at p. 1. Mr. Hamdan moves to suppress evidence obtained as a result of a traffic stop. Docket No. 29. He contends that "the stop was without reasonable suspicion; law enforcement illegally prolonged the stop; and officers lacked reasonable suspicion or probable cause to search the occupants of the vehicle at the time they did so, all in violation of the Fourth Amendment." Id. The government resists the motion. Docket No. 31. The matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD L.R. CRIM 57.11.

## FACTS

An evidentiary hearing was held on March 1, 2024.  Mr. Hamdan attended in person along with his lawyer, Hannah Moravec.  The government was represented by its Assistant United States Attorney, Elizabeth Ebert.  Two witnesses testified and nine exhibits were received into evidence.[1]  From this testimony and these exhibits, the court makes the following findings of fact.

Detective Brian Mayberry testified that he is a South Dakota certified law enforcement officer, and detective with the Sioux Falls Police Department (S.F.P.D.) Violent Crimes Unit.  He has been in that position for a little over a year.  His experience includes about a year as a corrections officer at the South Dakota State Penitentiary; a year as a patrol officer in Huron, South Dakota, which included his training at the South Dakota Law Enforcement Academy; and subsequent employment with the S.F.P.D. as a patrol officer, defensive tactics instructor, and electronics and breaching techniques "guru" on the Sioux Falls S.W.A.T. team.  At the time of the traffic stop at issue here, Detective Mayberry was an officer on the S.F.P.D. Street Crimes Unit, whose goal was to take a proactive approach to preventing such acts as "gang

---

[1] Exhibit 1 displays the patrol car dashcam footage, which includes no timestamp.  Exhibit 2 displays Detective Mayberry's bodycam footage, which includes a timestamp.  Exhibit 3 displays Detective Leacraft's bodycam footage, which includes a timestamp.  Correspondingly, citations to Exhibit 1 refer to the timing of the videoclip.  Citations to Exhibit 2 and Exhibit 3 refer to time of day, as determined by the detectives' bodycams.  Because the entirety of the relevant footage occurred in the hour after midnight, "00" will be omitted from all time-of-day citations.  For example, a citation to a time of day of 28:31 shall be understood to represent 12:28 a.m. plus 31 seconds.  Exhibit 1 has no audio.  Exhibit 2 and Exhibit 3 have no audio for the first thirty seconds and audio thereafter.

violence, gun violence, sex trafficking, prostitution, smaller narcotics issues," as well as assisting with the location of BOLO[2] suspects and assisting with homicides. Detective Mayberry testified that he is extensively (and empirically) trained on observing South Dakota traffic law violations.

Detective Mayberry testified that his unit tends to focus on higher-crime areas in Sioux Falls. Detective Leacraft testified similarly. Due to the dangerous nature of the unit's work, the most common practice for their street car work is for teams of two officers to ride together.

Detective Nelson Leacraft testified that he is a South Dakota certified law enforcement officer, and also a detective with the S.F.P.D. Violent Crimes Unit. He has been in that role for a little over a year but served in a similar capacity as an officer with the Street Crimes Unit. Prior to that role, he was a patrol officer for 3 1/2 years.[3] In total, he has been with the S.F.P.D. for more than 8 1/2 years. Upon his hiring, his training included in-house training at the S.F.P.D., the Law Enforcement Academy in Pierre, and experiential training with an S.F.P.D. officer. This included training on observing traffic violations and familiarity with traffic offenses under the South Dakota Codified Laws.

Detective Mayberry testified that on the morning of September 4, 2022, he was on duty with the Street Crimes Unit, driving an unmarked grey Ford

---

[2] BOLO stands for "be on the lookout for." United States v. Nelson, 4:21-CR-40137-KES, 2022 WL 16734666, at *3 (D.S.D. Aug. 9, 2022), adopted as modified, 2022 WL 6700595 (D.S.D. Oct. 11, 2022).

[3] Both Detectives Mayberry and Leacraft held the title of "Officer" at the time of the traffic stop at issue here. To avoid unnecessary confusion, both will be referred to as "Detective" in all references hereinafter.

Explorer that had working lights and sirens, while his partner Detective Leacraft sat on the passenger side and worked the handheld computer system.

Detective Mayberry testified that before the traffic stop took place, he was in the area of the Freedom Gas Station on the 1600 block of South Minnesota Avenue near 24th or 25th Street in Sioux Falls. Detective Leacraft testified that they were in the area of West 24th Street and South Spring Avenue. Detective Leacraft testified that Freedom Valu Center gas station is known for drug activity, gun violations, and gang activity in the evening hours. Detective Mayberry testified that one can see the north end of the Freedom Gas Station parking lot very well from the place where the detectives were situated. An aerial map of this part of Sioux Falls admitted into evidence confirms that there are no architectural obstacles between where Detective Leacraft indicated the officers were perched and the point where the Ford Taurus exited the gas station. See Ex. E.

Although it was nighttime, Detective Leacraft testified that the gas station is "very—highly lit." He testified that one can see a "good portion" of the gas station parking lot from where the detectives were watching. Detective Mayberry testified that at approximately 12:30 a.m., he and Detective Leacraft observed a white Ford Explorer with South Dakota plate 1EB 317 departing the gas station without coming to a complete stop before entering the public roadway. He later, after being prompted by counsel, testified that the vehicle was a Ford Taurus. Detective Leacraft testified he observed a 2017 white Ford Taurus exiting the gas station parking lot onto 24th Street without coming to a

4

stop.  Dashcam footage confirms that the vehicle was a Ford Taurus.  Ex. 1. at 00:55.

Detective Mayberry testified that the driver had committed a traffic violation at this point.  He testified that he and Officer Leacraft decided to run the license plate on the vehicle and get in position to make a traffic stop.  They were able to read the license plate before the vehicle turned north on Minnesota Avenue.  Then, while they were catching back up to the vehicle, Officer Leacraft was able to run the license plate through their computer, which revealed the car belonged to Marwan Hamdan.  At this point, when the officers are catching up to the vehicle on Minnesota Avenue, is where the government's Exhibit 1—the dashcam footage—begins.  See Ex. 1 at 00:00—00:26.

Detective Mayberry testified that he did not recognize the name "Marwan Hamdan," but his partner instantly did, and informed Detective Mayberry, "for officer safety reasons," that Mr. Hamdan had been a suspect in a "prior" shooting.  Detective Leacraft stated that this prior shooting occurred six months before the traffic stop.  Detective Leacraft testified that he was also aware of Mr. Hamdan from previous law enforcement encounters and from "perusing different case reports."  He knew that Mr. Hamdan was on parole and of his prior firearms offenses.  He further testified that this would have been, to his knowledge, Mr. Hamdan's first encounter with law enforcement following the shooting where Mr. Hamdan was a person of interest.  Detective Leacraft testified that the police would approach Mr. Hamdan cautiously for these

reasons.  At the evidentiary hearing, defense counsel refreshed Detective Leacraft's memory by showing him two supplemental reports related to that prior shooting, from which Detective Leacraft testified that Mr. Hamdan was not officially named as a person of interest in either report.

Detective Mayberry put on the red and blue lights just north of the intersection of 18th Street and Minnesota Ave.  Id. at 00:28.  The Ford Taurus activated its blinker and both vehicles pulled into the parking lot of Taco Bell on the east side of Minnesota Avenue.  Id. at 00:37—00:53.  Both officers immediately approached the vehicle, with Detective Mayberry on the driver's side and Detective Leacraft on the passenger side.  Id. at 1:00–1:07.  Both officers were shining flashlights into the car.  Id. at 01:23.

Detective Mayberry explained to the female driver of the Ford Taurus, "Leslie," the reason for the stop and asked for her license.  Ex. 2 at 28:10—28:20.  While this was happening, Detective Leacraft twice knocked on the passenger side window and asked the vehicle occupants to keep that window down.  Ex. 3 at 28:07—28:23.  Detective Leacraft testified that he recognized Mr. Hamdan as the front seat passenger.  Leslie already had her license in her hand and handed it to Detective Mayberry.  Ex. 2 at 28:10—28:22.

Detective Mayberry then asked for her insurance.  Id. at 28:22.  Mr. Hamdan said he had the insurance card on his phone.  Id. at 28:28—28:31.  Detective Mayberry asked if the car belonged to Mr. Hamdan, and Mr. Hamdan responded affirmatively.  Id.  While Mr. Hamdan appeared to be looking on his phone for his insurance card, Detective Mayberry asked, "What

6

are you guys up to tonight?" Id. at 28:49. Leslie stated they were unsure, but they would "maybe go downtown." Id. at 28:50—28:55. Leslie then handed Detective Mayberry Mr. Hamdan's phone showing an insurance card with the name Marwan Hamdan. Id. at 28:55—29:01. Both Leslie and Mr. Hamdan confirmed that the passenger's name was, indeed, Marwan Hamdan. Id. at 29:01—29:16. The driver then confirmed that her name was Leslie. Id. at 29:20. Mr. Hamdan handed his driver's license to Officer Leacraft. Ex. 3 at 29:10—29:13.

Detective Mayberry testified that at this point, he did not know how many people were in the car because the car had dark tinted windows and it was nighttime. Detective Mayberry asked if Leslie minded coming back to the patrol car while he ran her information, and she got out of the car and followed him. Ex. 2 at 29:20—29:26. Detective Mayberry testified that he asked Leslie to do this in light of his understanding that Mr. Hamdan was a suspect in a shooting. He explained that doing so allowed him to (1) smell the driver for alcohol or marijuana; (2) get the driver out of their comfort zone so as to mitigate any potential violent acts the driver may commit; and (3) the separation of parties fosters an environment where stories are less likely to be homogenous. He testified that he brings drivers into the patrol car in the majority of his traffic stops.

Leslie sat in the front passenger side of the patrol car and Detective Mayberry got in the driver's side and both shut their doors. Id. at 29:26—29:42. Detective Mayberry asked Leslie if the address on her license was still

7

current, and she said they had recently moved.  Id. at 29:47—29:55.  The detective stated he would "probably get [the new address] from her "here in a second."  Id. at 29:55–30:00.  Detective Mayberry asked Leslie again whether she was going downtown and what she was up to.  Leslie replied that they had just picked up their friends and confirmed that they were probably heading downtown.  Id. at 30:00–30:20.  Detective Mayberry next entered Leslie's new address into his system.  Id. at 30:20—30:50.

Meanwhile, Detective Leacraft asked Mr. Hamdan if the occupants of Mr. Hamdan's car knew the occupants of a grey Jeep in the parking lot, whose occupants were filming the officers.  Ex. 3 at 29:27—29:45.  Mr. Hamdan said that one of the occupants was his cousin, and that the entourage was about to go downtown.  Id. at 29:45—30.00.  Detective Leacraft then asked for and retrieved the licenses from the back seat passengers.  Id. at 30:00—30:13.

At this point, the grey vehicle Detective Leacraft had noticed drove nearer the stop site with the window rolled down.  Id. at 30:21—30:25.  Detective Leacraft said "How's it going?" to the occupants, who did not respond and drove away.  Id. at 30:24—30:27.  Detective Leacraft said to the occupants of Mr. Hamdan's vehicle that he knew one of the occupants of the grey vehicle, whose name he pronounced "Faseel," and stated he was wanted.  Mr. Hamdan and Detective Leacraft then appeared to disagree on whether "Faseel" was wanted.  Id. at 30:27—30:49.  Detective Leacraft testified that he was aware this man had previously pulled an AK-47 on someone.

Detective Leacraft then asked if anyone had a warrant, was on parole, or was on probation.  A man named Habeeb in the back seat said he was on parole and Detective Leacraft said he remembered Habeeb from a prior foot pursuit concerning a parole violation.  Id. at 30:49—31:21.  Detective Leacraft testified that in that prior pursuit, Habeeb had run from a traffic stop and threw a firearm while being pursued.

Another rear seat occupant, Tamaree, stated she was not on parole or probation.  Mr. Hamdan asked Detective Leacraft why they were pulled over.  Id. at 31:21—31.36.  Detective Leacraft told Mr. Hamdan that Leslie had not stopped when exiting the gas station.  Id. at 31:36—31:53.  Detective Leacraft then started calling in the license information on his radio.  Id. at 32:00—33:57.  Detective Leacraft also called for backup which he testified was on account of the presence of four total occupants—two of which had a history of firearms violations.  He testified his caution was augmented by his knowledge that both Habeeb and Mr. Hamdan were known affiliates of the Gangster Disciples gang.

Detective Leacraft asked Mr. Hamdan what the nature of his prior charges were, and Mr. Hamdan, appearing to have grown frustrated, told Detective Leacraft that he could ask dispatch about this.  He then told Detective Leacraft his prior charges.  Habeeb told Detective Leacraft that he had gotten out of jail and was on parole.  Id. at 33:57—34:22.

In the patrol car, Detective Mayberry asked Leslie questions such as where Mr. Hamdan lived, whether anyone had been smoking weed in the car,

whether there was any weed in the car, whether Leslie was on parole or probation, and who else was in the car.  Ex. 2 at 30:50—32.04.  He testified that he asked about Leslie and Marwan's relationship because he thought it was "weird" that she was driving his car.

When reviewing Mr. Hamdan's record, he noted that Mr. Hamdan was on parole and asked Leslie whether he had been drinking which she responded in the negative.  He asked several times whether the car belonged to Mr. Hamdan. Id. at 30:50—32.55.  He asked whether a weapon was in the car and Leslie stated there was not.  Id. at 33:00—33:10.  He asked several questions about Mr. Hamdan's parole (terms of / duration) for which Leslie did not know the answers.  Id. at 33:10—34:10.  He then asked for Leslie's phone number to put in the system.  Id. at 34:20—34:53.  Detective Mayberry testified that updating addresses and phone numbers in his system is routine.  He then asked again whether Mr. Hamdan had been drinking.  Leslie again said he had not.  Id. at 34:50—34:59.

Detective Mayberry testified that when someone who is stopped is a parolee, additional information may come up on his screen, such as specific parole terms like "no drinking," "no bars," or a curfew.  He testified that he learned Mr. Hamdan had a curfew and was not allowed to drink.  He found it curious that the party was headed downtown because he believed that their trip would lead to a bar, which was contrary to Mr. Hamdan's parole terms.  He testified that the traffic stop extended because of the parole information and how it conflicted with the notion of going downtown.  Although Detective

10

Mayberry saw that Mr. Hamdan had a curfew and was not allowed to drink, he testified he did not know what the time of his curfew was.

When backup arrived, Detective Leacraft approached the driver's side window of his patrol car and asked Leslie how she knew the men in the car, to which she replied that they were her friends.  Id. at 35:18—35:23; Ex. 1 at 07:52.  Detective Leacraft asked whose car it was, and why Leslie was driving Mr. Hamdan's car.  Ex. 2 at 35:23—35:36.  Detective Leacraft then asked if Detective Mayberry would look up a name in the computer "Faisel."  Id. at 35:40—36:03.  Detective Leacraft told Detective Mayberry that the name was the person in the grey Jeep that was filming them from the passenger seat.  Id. Detective Leacraft testified that the reason he had Detective Mayberry look up Faisal was so that he would know how to respond if Faisal returned to the parking lot.  After trying a different spelling, Detective Mayberry found the correct record and asked Leslie how she knew Faisal.  She stated that they were all going to meet up.  Id. at 36:03—36:43.  The detectives learned from their system that Faisal did not have a warrant but was "on parole, too."  Id. at 36:43—36:58.  Detective Leacraft told Detective Mayberry that while Detective Mayberry talked with Leslie, Detective Leacraft was going to pull the men out of the car to check for weapons.  Id.

Because Faisal had "dope charges" on his record, Detective Mayberry asked Leslie if there were any drugs in the car.  Id. at 37:00—37:12.  Leslie said Faisal was not with her party.  Detective Mayberry appeared to be confused about this and asked who was in the back of the vehicle.  Id. at

37:00—37:30.  He began to look up one of the passengers, Tamaree, but then asked again whether Leslie knew Faisal.  37:30—38:45.  Leslie confirmed she did.  Id. at 38:45.  Detective Mayberry told Leslie that "it's not too big of a deal, but you should know that" Faisal should not be drinking because he is on parole.  39:00—39:09.  Detective Mayberry testified that at some point he also looked up Habeeb's record and was concerned from an officer safety standpoint because Habeeb was a parolee on an aggravated assault charge.

Detective Leacraft returned to Mr. Hamdan's vehicle.  Ex. 3 at 37:00.  He first had Habeeb step out from the driver's side back seat and, after asking permission, did a patdown search to check for weapons.  Id. at 37:00—37:30.  He did not find anything, and then went around to the passenger side and had Mr. Hamdan exit the vehicle for a patdown.  Id. at 37:30—37:50.  At this point, a bottle can be seen on the passenger side floorboard.  Id.  Detective Leacraft asked Mr. Hamdan if he was supposed to be drinking on parole.  Id. at 37:50—37:59.

Detective Leacraft had the female backseat passenger exit the vehicle as well.  He asked whose bottle of Hennessey was on the floorboard and Mr. Hamdan claimed it was his.  Detective Leacraft asked again, several times, whether Mr. Hamdan was supposed to be drinking while on parole, and Mr. Hamdan continued to answer that he was old enough to drink.  Id. at 37:59—38:33.  Detective Leacraft informed Mr. Hamdan that he cannot have an open container in the vehicle and that he would have to pour it out, which he did.  Id. at 38:33—39:07.  Detective Leacraft testified that it was at this

12

moment that dispatch got back to him that Mr. Hamdan had no warrants outstanding. This testimony is corroborated by Detective Leacraft's bodycam footage. Id. at 39:00.

Detective Leacraft then informed the party that he would be searching the vehicle for any other open containers, and Mr. Hamdan began arguing that Detective Leacraft needed either a warrant, or the permission of his mother, who owns the vehicle. Id. at 39:07—40:09. Mr. Hamdan requested several times that Detective Leacraft's "higher up" be brought to the scene. Id. There then ensued a conversation about the ownership of the vehicle, and Detective Mayberry confirmed that Mr. Hamdan was a co-owner. Id. at 40:00—40:21.

Detective Leacraft proceeded to search the front passenger side of the vehicle and found a firearm in the glove compartment. Detective Leacraft testified that the gun found was a black Glock 22 .40 caliber. He testified that .40 caliber casings were found at the shooting for which Mr. Hamdan was a person of interest. He came around and put Mr. Hamdan in handcuffs and told him he was being detained due to this find. Id. at 40:21—41:32.

After a moment of silence between Detective Mayberry and Leslie, he said to her "You gotta be honest with me are there any other guns in the car?" Leslie replied that her gun, registered to her, was in the glove compartment. Id. at 40:21—41:31. Officer Mayberry asked Leslie questions about the gun. She stated it was a Glock and a ".40 I think." She stated it was hers only, that she kept it for safety reasons but does not use it. She said that Mr. Hamdan did not use it and was not aware of it. Id. at 41:31—43.27. Detective Mayberry

testified that based on Leslie's answers, he began to believe that there may have been a straw purchase made by Leslie on behalf of Mr. Hamdan.

Detective Mayberry testified that he ultimately gave Leslie a verbal warning for the traffic violation. Detective Mayberry testified that he did not delay in any way the traffic stop so that Detective Leacraft would have more time car-side. Detective Leacraft did not arrest Mr. Hamdan. He testified that he cited Mr. Hamdan for the open container and collected the gun "for further processing."

Mr. Hamdan now moves to suppress the discovery of any evidence resulting from Mr. Hamdan's pat-down and ensuing search on the grounds that "the stop was without reasonable suspicion; law enforcement illegally prolonged the stop; and officers lacked reasonable suspicion or probable cause to search the occupants of the vehicle at the time they did so, all in violation of the Fourth Amendment." Docket No. 29 at p. 1.

## DISCUSSION

### A.  Whether there was Probable Cause or Reasonable Suspicion to Initiate the Traffic Stop

Mr. Hamdan first argues that because no footage exists of Leslie exiting Freedom Valu Center without stopping, the government "cannot meet its burden of showing that the stop was supported by reasonable suspicion." Docket No. 30 at p. 5. The government responds that the lack of video footage "does not bar the government from establishing that the stop was supported by reasonable suspicion." Docket No. 31 at p. 10. The government is correct.

14

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A "seizure" occurs when a reasonable person understands "that he [is] not at liberty to ignore the police . . . and go about his business." Michigan v. Chesternut, 486 U.S. 567, 569 (1988). Traffic stops are a type of seizure. United States v. Sanchez, 955 F.3d 669, 674 (8th Cir. 2020) (citation omitted). And so, on the Fourth Amendment's terms, a traffic stop must be reasonable. United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004).

"[A] traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." United States v. Green, 946 F.3d 433, 438 (8th Cir. 2019) (citation omitted). When a police officer observes a traffic violation, no matter how minor, probable cause exists to initiate a stop. United States v. Mendoza, 677 F.3d 822, 827 (8th Cir. 2012).

When probable cause is challenged, it is the government's burden to establish its existence. United States v. $45,000.00 in U.S. Currency, 749 F.3d 709, 716 (8th Cir. 2014) (citation omitted). The credible testimony of an officer as to his observations of a traffic violation is all that is required to satisfy that burden. Cf. Mendoza, 677 F.3d at 828.

In the instant case, both Detectives Mayberry and Leacraft testified that they observed a white Ford Taurus exit the north side of the Freedom Valu Center parking lot without coming to a complete stop before entering 24th

15

Street.  The court found this testimony credible.  Failing to stop before entering
a public roadway is a violation of the traffic laws of South Dakota.  <u>See</u> SDCL
§ 32-29-2.2.  The officers' credible testimony established probable cause for the
stop.  Mr. Hamdan's theory that the testimony must be supplemented with
corroborating video footage finds no support in our Fourth Amendment case
law.  <u>See</u> <u>United States v. Thomas</u>, 4:22-CR-40046-1, 2023 WL 7390476, at *7
(D.S.D. Aug. 29, 2023), <u>adopted</u>, 2023 WL 7103367 (D.S.D. Oct. 27, 2023).

## B.  Whether the Officers had Reasonable Suspicion to Conduct a Patdown of Mr. Hamdan

Mr. Hamdan argues that the officers did not have the requisite
reasonable suspicion to conduct his patdown search.  Docket No. 31 at p. 9.
The government responds that given Mr. Hamdan's firearms history, "[t]he
officers had a legitimate interest to . . . assure their own officer safety."  Docket
No. 31 at p. 14.  Again, on this matter, the government is correct.

Under the Fourth Amendment, citizens have the  right "to be free from
unreasonable governmental intrusion" on to their persons.  <u>Terry v. Ohio</u>, 392
U.S. 1, 9 (1968).  In the case of a man walking down the street, <u>Terry v. Ohio</u>
instructs that an officer's seizure of that man is valid if the officer has
"reasonable and articulable suspicion that criminal activity may be afoot."
<u>United States v. Navarette-Brown</u>, 192 F.3d 786, 790 (8th Cir. 1999) (citing
<u>Terry</u>, 392 U.S. at 25–31).  Should a valid seizure initiate, the seizing officer
may "take any additional steps that are reasonably necessary to protect their
personal safety and to maintain the status quo during the course of the stop."
<u>Id.</u> (citing <u>United States v. Hensley</u>, 469 U.S. 221, 235 (1985)).  Where the

officer has a reasonable, articulable suspicion that the suspect is armed and dangerous, one of those steps may be to "conduct a limited pat-down search of the individual's outer clothing for the purpose of uncovering concealed weapons." United States v. Gilliam, 520 F.3d 844, 848 (8th Cir. 2008).

In the context of a traffic stop, the first prong of the Terry analysis—the question of whether criminal activity may be afoot—is satisfied so long as the seizing officer has probable cause or reasonable suspicion that a traffic violation has occurred. Arizona v. Johnson, 555 U.S. 323, 327 (2009). In that event, the prong is satisfied not just as to the driver, but for "everyone in the vehicle." Id. (citation omitted). So, should the seizing officer have reasonable suspicion that anyone in the vehicle is armed and dangerous, the officer may conduct a safety patdown of that occupant. Id.

Whether an officer's suspicion is reasonable depends on "the totality of the circumstances in light of the officers' experience and specialized training." United States v. Williams, 39 F.4th 1034, 1042 (8th Cir. 2022) (citation omitted). Factors that help inform the inquiry include time of day, United States v. Roggeman, 279 F.3d 573, 578 (8th Cir. 2002), whether the stop was conducted in a high-crime area, United States v. Stewart, 631 F.3d 453, 458 (8th Cir. 2011), and the criminal history and gang affiliation of the occupants. United States v. Roelandt, 827 F.3d 746, 748–49 (8th Cir. 2016) (citing Stewart, 631 F.3d at 457–58).

In the instant case, the stop occurred after midnight when a car illegally exited what the detectives testified was a high-crime gas station / sometime

subject of a gang turf war.  That gas station, the detectives testified, was within a high-crime area itself.  Detective Leacraft testified of his awareness of Mr. Hamdan's criminal history, which included a firearms violation.  <u>Accord</u> Ex. 2 at 33:00.

He further testified of his knowledge of Habeeb's firearms-related criminal history, including a foot pursuit the previous year where Habeeb threw a firearm as he ran from Detective Leacraft.  Detective Leacraft also testified concerning Mr. Hamdan's and Habeeb's affiliation with the Gangster Disciples.  Further, Detective Leacraft testified that Mr. Hamdan had been named as a person of interest in a shooting six months prior.  Although Mr. Hamdan presented a report to Detective Leacraft at the suppression hearing that did not name Mr. Hamdan as an official suspect in that shooting, Detective Leacraft credibly, and forcefully, testified that Mr. Hamdan was named as a person of interest in internal communications.

Mr. Hamdan argued at the suppression hearing that the information relied on by the detectives was rendered stale by the passage of time.  But '[t]here is no bright-line test for determining when information is stale."  <u>United States v. Stachowiak</u>, 521 F.3d 852, 856 (8th Cir. 2008) (citation omitted).  In <u>United States v. Preston</u>, an officer relied on his knowledge of the defendant's involvement "in prior cases . . . involving domestic violence and guns" to conduct a protective patdown.  685 F.3d 685, 689–90 (8th Cir. 2012).  "[T]he most recent of these incidents occurred three years prior to the stop at issue." <u>Id.</u> at 690.

18

The Eighth Circuit ruled the information was not stale when considered in tandem with the suspect being under a current protection order and his name being mentioned in officer safety briefings. Id. at 691. The court can find no meaningful difference between the facts of Preston and the present case. As the court determines reasonableness, it is reminded that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. Given the totality of the circumstances here, the court holds that the detectives' suspicion that Mr. Hamdan was armed and dangerous was reasonable.

## C.    Whether the Officers Illegally Prolonged the Stop

Mr. Hamdan's prolongment argument consists of two parts. The first argues that "[t]he stop was extended beyond the time reasonably required to complete the mission of the traffic stop." Docket No. 30 at p. 5. The second argues that the "[o]fficers lacked reasonable suspicion to extend the stop in order to pat-down Mr. Hamdan and Mr. [Habeeb] Abdulkadir and to ask additional investigatory questions." Id. at p. 8. The government counters that the purpose of the mission was still ongoing at the time alcohol was discovered "because Officer Mayberry was still talking with Ordonez-Saucedo (Leslie) while running her and the occupant's information." Docket No. 31 at p. 12 (citing Rodriguez v. United States, 575 U.S. 348, 354 (2015); Florida v. Royer, 460

U.S. 491, 500 (1983) (plurality opinion)).  The facts here present a close question.

"A seizure for a traffic violation justifies a police investigation of that violation."  Rodriguez, 575 U.S. at 354.  A traffic stop is meant to be "a relatively brief encounter" that "last[s] no longer than is necessary to effectuate the purpose" of "addressing the infraction."  Id. (quoting Knowles v. Iowa, 525 U.S. 113, 117 (1998); Royer, 460 U.S. at 500) (some alterations omitted)).  "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  Id.

None of this is to say that police officers may not ask questions unrelated to the traffic infraction while diligently pursuing that mission.  They may—so long as those questions do "not lengthen the roadside detention."  Id. (citing Johnson, 555 U.S. at 327–28).  But when the questions prolong the duration of a traffic stop beyond its reasonable limits, the stop becomes unlawful.  Illinois v. Caballes, 543 U.S. 405, 407 (2005).

Functions considered incidental to a traffic stop include "running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories . . . and asking the occupants about their destination, route, and purpose."  United States v. Mathes, 58 F.4th 990, 993 (8th Cir. 2023) (citation omitted) (alteration in original).  "On-scene investigation into other crimes, however, detours from [the] mission."  Rodriguez, 575 U.S. at 356.  "So too do safety precautions taken in order to facilitate such detours."  Id.

Police may "attend to related safety concerns" during a traffic stop.  Id.
In so doing, police may ask all occupants to exit the stopped vehicle.  Maryland
v. Wilson, 519 U.S. 408, 410 (1997).  And when reasonable suspicion allows,
police may further conduct a patdown of those individuals to check for
concealed weapons.  Johnson, 555 U.S. at 327.  All this for good reason—
traffic stops "are especially fraught with danger to police officers."  Michigan v.
Long, 463 U.S. 1032, 1048 (1983).  Ensuring police safety "is both legitimate
and weighty."  Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977).

But to be clear—the Constitution allows these acts so that an officer may
"complete his mission safely."  Rodriguez, 575 U.S. at 356.  "The purpose of [a
patdown] search is not to discover evidence of crime, but to allow the officer to
pursue his investigation without fear of violence."  Minnesota v. Dickerson, 508
U.S. 366, 373 (1993).  And so, where a traffic stop's mission has—or
reasonably should have—concluded, an as-yet unrealized patdown cannot
serve as independent justification for the stop's extension.  See Rodriguez, 575
U.S. at 356 ("[T]he government's officer safety interest stems from the mission
of the stop itself.");  Terry, 392 U.S. at 19 ("The scope of the search must be
strictly tied to and justified by the circumstances which rendered its initiation
possible.") (citation and internal quotation marks omitted).  Any extension of
the traffic stop beyond its original mission requires reasonable suspicion of an
unrelated crime.  United States v. Woods, 829 F.3d 675, 679 (8th Cir. 2016).

In the instant case it appears there was sufficient time to complete the
mission of the stop—giving Leslie a verbal warning for failing to come to a

complete stop when exiting a gas station—before the time Detective Leacraft initiated the patdown searches.  Detective Mayberry spent a meaningful amount of his time with Leslie asking questions he already knew the answer to, or concerning Mr. Hamdan and unrelated to the stop's mission—in an attempt to investigate "other crimes."  <u>Rodriguez</u>, 575 U.S. at 356.  For example:

- "Is there any weed in the car?" Ex. 2 at 30:57.

- "Was anybody smoking in there earlier?" <u>Id.</u> at 31:00.

- "You said the car is registered to Marwan?" <u>Id.</u> at 31:15.

- "So you guys are heading downtown?" <u>Id.</u> at 32:13 ((Detective Mayberry had just asked this question at Ex. 2 30:12).

- "So is Marwan your boyfriend?" <u>Id.</u> at 32:34

- "So I see he is on parole.  How long is he on parole for?" <u>Id.</u> at 32:37.

- "Has he been drinking or anything like that?" <u>Id.</u> at 32:48.

- "And this is his car, though?" <u>Id.</u> at 32:54.

- "Has he been doing alright?" <u>Id.</u> at 33:14.

- "Has he been in trouble at all?" <u>Id.</u> at 33:15.

- "When did he get out?" <u>Id.</u> at 33:20.

- You don't know how much longer he has on parole, though?" <u>Id.</u> at 33:38.

- "Is his parole out of here? Or is it out of . . ." <u>Id.</u> at 33:48.

- "Oh, he doesn't have to go in the office?" <u>Id.</u> at 33:59.

- "Do you know if he's been drinking or smokin though?  Nothin?" <u>Id.</u> at 34:52.

During the course of this questioning, Detective Mayberry looked up the records of Leslie and Mr. Hamdan.  <u>Id.</u> at 29:47—32:03.  It was Detective

Leacraft who took the identification of Habeeb and Tamaree and radioed in a request for their information. Ex. 3 at 30:00—30:13, 32:00—32:57. And it is true that dispatch did not return with that information until after the alcohol had already been discovered. Id. at 39:00. But Detective Mayberry was able to look up Mr. Hamdan's record on his in-car computer without a driver's license. Ex. 2 at 32:03. The court presumes that a similar, expedient check of Tamaree and Habeeb's record could have been accomplished by the time Detective Leacraft circled back to the patrol car. If not, Detective Leacraft had Tamaree's and Habeeb's licenses in hand when he approached Detective Mayberry's door. Ex. 3 at 35:17.

But rather than focus on the mission of the stop, Detective Leacraft asked Detective Mayberry to look up the record of someone who was in another car and had driven away—Faisal—to find out whether there was a warrant for his arrest—a matter wholly unrelated to Leslie's failure to stop. Ex. 2 at 35:45. Also, during this time, Detective Leacraft also asked Leslie questions that he already knew the answer to, questions Detective Mayberry had already asked, or which were unrelated to the mission of the stop. See id. at 35:18 ("Are you related to these guys or how do you know these guys?"); id. at 35:30 ("Is this your car?"); id. at 35:34 ("Marwan's?"); id. at 35:35 ("Why you driving his car?").

The court concludes that the time Leslie spent in Detective Mayberry's car prior to Detective Leacraft's initiation of the patdown searches was sufficient for Detective Mayberry to have accomplished and terminated the

23

mission of the stop. Detective Mayberry had already updated Leslie's address
and phone number in the computer by 34:53. He knew by then there were no
warrants for Mr. Hamdan's arrest, knew Mr. Hamdan was on parole, and knew
some of the terms of his parole. From Detective Mayberry's point of view, all
that remained was to issue the verbal warning for the traffic violation,
something that could have been done in a minute or two.

The court understands that Detective Leacraft, being outnumbered,
could reasonably wait for the arrival of backup before asking the passengers to
exit the car and submit to patdown searches. Yet when backup arrived at
35:18, Detective Leacraft did not immediately embark on those patdown
searches. Rather, he went back to the patrol car and spent time looking up
Faisal, who had left the scene, and repeating questions to Leslie that Detective
Mayberry had already asked.

Although the question is a close one, the court concludes that the
mission of the traffic stop—Leslie's violation of the traffic laws—should
reasonably have been completed by 35:00 or 36:00. The fact that Detective
Leacraft had yet to conduct the patdown searches by the time Detective
Mayberry's mission with Leslie was—or reasonably should have been—
completed cannot resuscitate the traffic stop's mission because the
constitution only sustains a mission up to the terminus of its reasonable
duration. Rodriguez, 575 U.S. at 357. Without the mission to support the
stop, and without reasonable suspicion of any other crime, the detectives had

no justification to conduct an officer safety exercise. Id. at 356; Terry, 392 U.S. at 19.

There can be no doubt that the Fourth Amendment permits the stop of an otherwise suspect vehicle using the pretext of a minor traffic violation. See generally Whren v. United States, 517 U.S. 806 (1996). Indeed, police often use such maneuvers "to further valid, alternative, investigatory ends." Thomas, 2023 WL 7390476, at *6 (citation omitted). And sometimes, the pretextual stop results in the swift discovery of evidence sufficient to justify further investigation. For example, in Whren, as an officer approached the driver's window, "he immediately observed two large plastic bags of what appeared to be crack cocaine." 517 U.S. at 808–09. And in Thomas, the seizing officer smelled marijuana upon approaching the driver's door. 2023 WL 7390476, at *2. In such circumstances, an extension may occur because the fresh observations give rise to reasonable suspicion of criminality independent of the reason for the stop. Woods, 829 F.3d at 679; United States v. Milk, 66 F.4th 1121, 1131 (8th Cir. 2023).

The court is mindful of the detectives' testimony in the instant case that they utilize a proactive approach to preventing crime. But if a pretextual traffic stop does not yield the expedient manifestation of new criminal evidence sufficient to give rise to independent reasonable suspicion separate and apart from the original reason for the traffic stop, the Constitution bestows on those detectives an affirmative duty to diligently execute the mission of the traffic stop—in recognition of the occupants' Constitutional right to be free from

25

unwanted and unnecessarily prolonged government intrusion.  Rodriguez, 575 U.S. at 354; Terry, 392 U.S. at 9.  Rather than doing so, Detectives Mayberry and Leacraft prioritized a collateral investigation that lacked reasonable suspicion.  In so doing, they prolonged the stop longer than the Constitution allows.

The court is also mindful that the court's conclusion that the mission of the traffic stop (the traffic violation) should reasonably have been concluded by 35:00 or 36:00 means the officers should have wrapped up the traffic stop investigation in a matter of 7 minutes or so.  However, Rodriguez teaches that the "[r]easonableness of a seizure . . . depends on what the police in fact do." Rodriguez, 575 U.S. at 357.  Diligence is "gauged . . . by noting what the officer actually did and how he did it."  Id.  Here, Detective Mayberry asked Leslie a series of questions completely unrelated to the reason for the stop that prolonged the duration of the stop.  Detective Leacraft, when he was first presented with the opportunity to safely conduct pat-downs of the passengers after back-up arrived did not pursue that activity.  Instead, he chose to pursue investigation of Faisal who was no longer on the scene and to ask questions of Leslie that Detective Mayberry had already asked.  The court concludes the duration of the stop violated the Fourth Amendment.

**D.    Whether the Evidence Must be Suppressed**

Although the Fourth Amendment itself "contains no provision expressly precluding the use of evidence obtained in violation of its commands," Arizona v. Edwards, 514 U.S. 1, 10 (1995), a judicially created rule exists that requires

courts to exclude such evidence when the deterrent benefits outweigh the costs to society that result from its exclusion.  United States v. Forjan, 66 F.4th 739, 748 (8th Cir. 2023) (citing Utah v. Strieff, 579 U.S. 232, 235, 237–38 (2016)). This exclusionary rule "compel[s] respect for the constitutional guaranty [of the Fourth Amendment] in the only effectively available way—by removing the incentive to disregard it."  Elkins v. United States, 364 U.S. 206, 217 (1960).

Courts are cognizant that the utilization of the exclusionary rule should be a "last resort, not [a] first impulse."  Hudson v. Michigan, 547 U.S. 586, 591 (2006).  After all, the consequence of suppression is often the freedom of the guilty or the empowerment of the dangerous.  Id.  And so, "the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served."  United States v. Calandra, 414 U.S. 338, 348 (1974).

Situations that do not meet this criterion can be understood by extrapolating from the terms of the rule's exceptions—such as when the evidence arrives, or inevitably would have arrived, through an independent source, Murray v. United States, 487 U.S. 533, 538–39 (1988) (plurality opinion) (citation omitted); Nix v. Williams, 467 U.S. 431, 443–44 (1984), or when police, in good faith, rely on a defective warrant, United States v. Leon, 468 U.S. 897, 922 (1984), or a warrant that is the product of an isolated administrative error, Herring v. United States, 555 U.S. 135, 137–39 (2009), or when "the illegal actions of the police" have been rendered attenuated "by

27

means sufficiently distinguishable" that the evidence is "purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963).

Each exception reinforces an understanding that the target of the exclusionary rule is police conduct that is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring, 555 U.S. at 144. The mere fact of a Fourth Amendment violation does not dictate exclusion. Id. at 141. The conduct must be reckless, deliberate, grossly negligent, or recurring/systemic negligence. Id. The inquiry into deterrence and culpability is an objective one—it is not based on the actual officer's subjective awareness of the nature of his conduct. Id. at 145.

In the instant case, the court finds no evidence of a deliberate violation of Mr. Hamdan's Fourth Amendment rights. The traffic stop portion of the events reasonably should have been concluded by 35:00 or 36:00. Backup officers arrived at 35:18. Had Detective Leacraft immediately proceeded to order the passengers out of the car for patdown searches after backup arrived, the open container of alcohol would have been discovered before the terminus of the traffic stop should have occurred. The delay—until 37:30, was a matter of less than two minutes. The Fourth Amendment violation was a close question, and any violation was due to negligence or oversight by the officers. It was not deliberate, reckless, grossly negligent, or recurring/systemic. The court finds that suppressing the evidence under these facts would serve no deterrent

purpose. Accordingly, it is recommended that Mr. Hamdan's motion to suppress be denied.

## CONCLUSION

Based on the facts, law, and analysis discussed above, this magistrate judge respectfully recommends denying Mr. Hamdan's motion to suppress. Docket No. 29.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990); Nash v. Black, 781 F.2d 665, 667 & n.3 (8th Cir. 1986).

DATED this 13th day of March, 2024.

BY THE COURT:

VERONICA L. DUFFY

United States Magistrate Judge

29