UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARWAN ABDULKAREEM HAMDAN,<br><br>Defendant. | 4:23-40041-KES<br><br>ORDER ADOPTING REPORT &<br>RECOMMENDATION AS AMENDED<br>AND DENYING MOTION TO<br>SUPPRESS |

Plaintiff, the United States of America, filed an indictment against defendant, Marwan Hamdan, for possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). Docket 1. Hamdan moves to suppress all evidence, including the alleged firearm that forms the basis for his criminal charge, that law enforcement officers obtained from a traffic stop on September 4, 2022. *See* Docket 29. The government resists the motion. Docket 31. Addressing Hamdan's motion, Magistrate Judge Veronica L. Duffy held an evidentiary hearing and issued a Report and Recommendation, and recommends this court deny Hamdan's motion. Docket 32; Docket 40. After reviewing the record, all of the parties' filings, and the Report, the court issues the following order.

## STANDARD OF REVIEW

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 59 of the Federal Rules of Criminal

Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTS

After a de novo review, the court makes the following factual determinations for purposes of addressing Hamdan's motion to suppress:[1]

In the early morning hours of September 4, 2022, at approximately 12:30 a.m., then-officer Brian Mayberry and then-officer Nelson Leacraft were on duty with the street crimes unit of the Sioux Falls Police Department. Docket 37 at 6-8, 55-56, 58-59. The sky was dark out. *See id.* at 59; *see generally* Exhibit 1.[2] At the time of the stop, Mayberry had roughly two years' experience as a patrol officer as well as training on observing traffic violations. *See id.* at 5-6.

---

[1] The court acknowledges some of these factual findings implicate some of Hamdan's objections. The court addresses Hamdan's objections in the discussion section.

[2] Exhibit 1 is the dash camera footage to the patrol car in which Mayberry and Leacraft drove.

Similarly, Leacraft had at least three and a half years' experience as an officer with the Sioux Falls Police Department. *See id.* at 56.

While on patrol, Mayberry and Leacraft observed a white Ford Taurus exit the parking lot of a gas station, Freedom Valu Center, and pull onto West 24th street without first coming to a complete stop. *See id.* at 8-9, 59, 76-77, 94-95; Docket 35 at 9. Leacraft testified this gas station was "known for narcotics activity, different gun violations, and then also gang activity in and out of there." Docket 37 at 58. Leacraft also testified that "a couple gangs in town would feud over that gas station in the past 2020 era," and that he has been "in foot pursuits with other people with firearms out of [the] gas station." *Id.* at 94.

After observing the white Taurus fail to make a complete stop, Mayberry and Leacraft ran a search on its license plate number. *See* Docket 37 at 9-10, 59-60. The license plate search showed the car's registration belonged to Hamdan and his mother. *Id.* at 60; Docket 34 at 4. Leacraft recognized Hamdan's name because Hamdan was a person of interest in a shooting that occurred approximately six months prior to the stop. *See* Docket 37 at 60. Leacraft also knew that Hamdan was on parole for a firearms offense. *See id.* at 61; *see also* Docket 35 at 3 (confirming Hamdan's parole status for possession of a firearm by a felon). Furthermore, Leacraft had seen photos of Hamdan while in prison displaying Gangster Disciples signs, as well as representing Gangster Disciples in a music video outside of the prison context. *See* Docket

37 at 100-01. Leacraft also knew that Hamdan had tattoos indicating gang involvement. *See id.* at 101.

Following the license plate search, Mayberry and Leacraft activated their light, and the Taurus pulled into a Taco Bell parking lot. *See* Docket 37 at 10, 61. Mayberry approached the driver's side of the Taurus and Leacraft approached the passenger's side. *See id.* at 10, 62. Mayberry took the driver, Leslie Ordonez-Saucedo, over to the patrol car to talk. *See id.* at 11-12; Exhibit 2; Docket 34 at 11 (showing Leslie's full name).[3] Meanwhile, Leacraft stayed with the passengers of the Taurus and requested that each of them provide an ID. *See* Docket 37 at 62; Exhibit 3 at 2:00-3:10.[4] The passengers were Hamdan, Habeeb Abdulkadir, and another individual. *See* Exhibit 3 at 2:00-2:15, 4:00-4:25; Docket 34 at 6, 16, 18. The passengers each handed an ID to Leacraft and Leacraft looked over each of them. *See* Exhibit 3 at 2:00-2:10, 4:00-4:25. Hamdan sat in the front seat, with the two other passengers in the back. *Id.* at 4:00-4:25. None of the passengers at this point did anything or said anything that was out of the ordinary or suspicious, and all of them were cooperative. *See id.* at 1:00-4:25, 4:53-6:49.

When Leacraft saw Abdulkadir's ID, Leacraft recognized Abdulkadir from a prior incident. *See id.* 4:00-4:15. Specifically, about a year ago, Leacraft engaged in a foot pursuit of Abdulkadir after Abdulkadir ran from a traffic stop and then threw a firearm. *See* Docket 37 at 63. During the instant traffic stop,

---

[3] Exhibit 2 is Mayberry's body camera footage.

[4] Exhibit 3 is Leacraft's body camera footage.

Leacraft brought up this encounter with Abdulkadir, which Abdulkadir acknowledged. *See* Exhibit 3 at 4:00-4:15. Roughly six minutes later, Leacraft ordered the passengers out to frisk them, including Hamdan. *See id.* at 4:15-10:06. Once Hamdan exited the passenger seat, Leacraft saw in plain view an open bottle of alcohol on the car's floorboard of the front passenger's seat. *See id.* at 10:31-11:34; Docket 37 at 70. Shortly after finding the bottle, Leacraft searched the car for any remaining open containers and found a black Glock 22 .40 caliber handgun in the glove box. *See* Docket 37 at 71. Prior to ordering Hamdan out of the vehicle, neither Mayberry nor Leacraft saw a firearm, bottle of alcohol, or anything else of note, in the car. *See* Docket 37 at 11, 31-32, 91; *see generally* Exhibit 2; Exhibit 3.

## PROCEDURAL HISTORY

The Report recommends the court deny Hamdan's suppression motion. *See* Docket 40 at 29. In doing so, the Report credits Mayberry's and Leacraft's testimony that they saw the Taurus commit a traffic violation and thus found they permissibly initiated the traffic stop. *See id.* at 14-16. The Report then found that although officers had reasonable suspicion to conduct a pat-down search of Hamdan, the officers conducted the pat-down only after unreasonably prolonging the traffic stop, which violated the Fourth Amendment. *See id.* at 16-26. Despite finding this violation, the Report recommends the court not exclude the evidence officers obtained from the stop because of the good-faith exception in *United States v. Leon*, 468 U.S. 897, 913-22 (1984).

5

In response to the Report, Hamdan timely filed various factual and legal objections, including that officers did not permissibly initiate the traffic stop, that officers did not have reasonable suspicion to conduct a pat-down of Hamdan, and that the good-faith exception in *Leon* did not apply. Docket 44. Initially, the Government did not file any objections.

After reviewing the Report and Hamdan's objections, this court requested further briefing on the narrow issue of whether the *Leon* good faith exception should apply. *See* Docket 45. The Government and Hamdan filed simultaneous briefs. *See* Docket 52; Docket 53. The Government's brief addressed not only whether the good faith exception should apply, but also whether officers violated the Fourth Amendment in the first place. *See* Docket 52. Hamdan's brief addressed only the good faith exception. *See* Docket 53. The Government and Hamdan responded to each other's briefs, and the matter is now ready for disposition. *See* Docket 56; Docket 58.

**DISCUSSION**

## I.  **Waiver**

The court addresses a threshold issue of whether it can consider the Government's arguments that Mayberry and Leacraft did not violate the Fourth Amendment, even though the Government failed to timely object to the Report on this issue and even though the arguments exceed the scope of the court's order for supplemental briefing. *See* Docket 52 at 2 n.2 (Government admitted it failed to timely object); Docket 58 at 1-3 (Hamdan argued the court should

6

disregard such arguments); Docket 45 (court's order asking only for briefing on whether to apply good-faith exception).

As discussed above, under 28 U.S.C. § 636(b)(1), a judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Generally, a party waives its right to de novo review when such party fails to object to a report and recommendation. *See United States v. Ewing*, 632 F.3d 412, 415 (8th Cir. 2011). But even if a party fails to object, the court may still review a report and recommendation *de novo* because the court exercises supervisory authority over magistrate judges. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985); *see also United States v. Meyer*, 439 F.3d 855, 858 (8th Cir. 2006); *Cf. United States v. Hayden*, 759 F.3d 842, 846 (8th Cir. 2014) (explaining that district courts can receive new evidence into the record without any specific justification while conducting *de novo* review of a magistrate judge's report and recommendation). Because the court can review the report and recommendation *de novo* irrespective of whether a party files objections, it follows that the court can consider untimely objections when conducting a review. *See Younce v. Barnhart*, 98 Fed. Appx. 305, 306 (5th Cir. 2004).

But just because the court can consider untimely objections does not necessarily mean it should. In deciding whether the court should consider the Government's untimely objections, the court notes multiple courts of appeals have held that a prevailing party in a report and recommendation need not object to preserve argument on secondary issues that the magistrate judge

7

decided unfavorably to such party. *See United States v. Street*, 917 F.3d 586, 597-98 (7th Cir. 2019); *Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 827 (6th Cir. 2019); *M. v. Falmouth Sch. Dep't*, 847 F.3d 19, 26-27 (1st Cir. 2017); *United States v. Willis*, 431 F.3d 709, 713 n.4 (9th Cir. 2005). For example, in *Street*, the Seventh Circuit rejected the defendant's argument that the Government had waived its right to the court of appeal's review when it did not object to the magistrate judge's report and recommendation finding officers did not have reasonable suspicion to conduct a *Terry* stop, but nevertheless denied the defendant's suppression motion based on the attenuation doctrine. *Street*, 917 F.3d at 592. In determining that the Government did not waive its right to review before the circuit court, *Street* analogized the issue to cross-appeals—specifically when a prevailing party before a district court may raise an unsuccessful argument on appeal without having to file a cross-appeal. *See id.* at 599. Observing that in the cross-appeal context, the dispositive issue is whether the argument would "produce the same outcome as the district court's order," the Seventh Circuit adopted this framework in the context of prevailing parties in a report and recommendation. *See id.* Specifically, the court held that so long as the report and recommendation issued a decision favorable to the prevailing party and the prevailing party's alternative arguments before the circuit court would provide no more favorable relief than the one it received before the district court, the prevailing party need not object to the reasoning of the magistrate judge. *See id.*

If a prevailing party need not object to preserve alternative arguments before the circuit court of appeals, it would be anomalous for a district court to not consider such party's arguments when reviewing the report and recommendation in the first instance. Here, the Government was the prevailing party because although the Report found officers violated Hamdan's Fourth Amendment rights, the Report nonetheless denied Hamdan's suppression motion based on the good-faith exception in *Leon*, 468 U.S. at 913-22. The Government's alternative argument—that officers did not violate Hamdan's Fourth Amendment rights—would not afford any further favorable relief than what the Report already recommends because in either instance, the Report would recommend denying Hamdan's suppression motion. Thus, the court finds it appropriate to consider the government's untimely objections.

The court recognizes that the Government's objections also exceed the scope of the court's order requesting additional briefing. *See* Docket 45. But Hamdan had a chance to respond to such arguments—and indeed, did in fact respond—so Hamdan has had an opportunity to be heard. *See* Docket 58. Thus, the court considers the Government's untimely objections[5] and exercises its discretion to conduct a *de novo* review of the Report on whether officers violated Hamdan's Fourth Amendment rights.

---

[5] Of course, nothing about this holding precludes a prevailing party from filing objections on alternative arguments so that the court has the benefit of briefing from all sides. In the future, the court would prefer such objections to be filed within the allotted 14-day window to promote judicial efficiency.

**II.      Whether Officers Violated Hamdan's Fourth Amendment Rights**

The court turns to the merits of Hamdan's motion to suppress.

Hamdan implicitly acknowledges that once Leacraft saw an open-bottle of

alcohol on Hamdan's passenger seat, Leacraft had probable cause to search the

vehicle—including the glove compartment—for additional alcohol because

South Dakota law prohibits transporting open containers of alcohol in a

vehicle. *See generally* Docket 30 (arguing only that detectives violated the

Fourth Amendment prior to Leacraft discovering a bottle of alcohol in plain

view); SDCL § 35-1-9.1 (open container law); *State v. Sound Sleeper*, 787

N.W.2d 787, 789, 792 (S.D. 2010) (applying open container law to parking lots);

*United States v. Vittetoe*, 86 F.4th 1200, 1202-03 (8th Cir. 2023) (setting forth

automobile exception which allows officers "to conduct a warrantless search of

an automobile if, at the time of the search, they have probable cause to believe

that the vehicle contains contraband or other evidence of a crime" (quoting

*United States v. Kennedy*, 427 F.3d 1136, 1140-41 (8th Cir. 2005)). Thus,

Leacraft did not violate the Fourth Amendment by discovering the gun inside

the glove compartment so long as Leacraft was in a lawful position to see the

open bottle of alcohol.

According to Hamdan, Leacraft violated the Fourth Amendment and was

not lawfully positioned to see the open bottle of alcohol for two reasons. First,

Hamdan argues the initial stop was unconstitutional. Docket 30 at 5; Docket

44 at 2. Second, Hamdan argues that even if Mayberry and Leacraft

permissibly stopped the Taurus, they unreasonably prolonged the stop. Docket

10

30 at 5-9; Docket 44 at 2. Because the detectives violated Hamdan's Fourth
Amendment rights, Hamdan argues suppression is the appropriate remedy,
and that the Report erred in applying the good-faith exception in *United States
v. Leon*, 468 U.S. 897, 913-22 (1984). Docket 44 at 3-5. The court addresses
these arguments in turn.

### 1. Traffic Stop

Hamdan first argues that officers did not have reasonable suspicion or
probable cause to pull over the car in which he rode. Docket 30 at 5; Docket 44
at 2. The Fourth Amendment protects against unreasonable searches and
seizures. U.S. Const. amend. IV. "A traffic stop constitutes a seizure of [a]
vehicle's occupants, including any passengers." *United States v. Hanel*, 993
F.3d 540, 543 (8th Cir. 2021) (quoting *United States v. Sanchez*, 572 F.3d 475,
478 (8th Cir. 2009)). Officers may permissibly initiate a traffic stop if such
officers have reasonable suspicion or probable cause that the driver has
committed a traffic violation, no matter how minor. *See United States v.
Rederick*, 65 F.4th 961, 965 (8th Cir. 2023). As relevant here, South Dakota
law makes it a misdemeanor for a driver to exit a parking lot without stopping
before entering a street. SDCL § 32-29-2.2.

Here, the Report credited both Mayberry's and Leacraft's testimony that
they observed a white Ford Taurus exit the Freedom Valu Center parking lot
without coming to a complete stop before entering 24th street. *See* Docket 40
at 15-16; *see also* Docket 37 at 9 (Mayberry); 59 (Leacraft). Because South
Dakota law prohibits a driver from exiting a parking lot without stopping before

11

entering a street, the Report found that Mayberry and Leacraft had probable cause to believe the Taurus committed a traffic violation. *See* Docket 40 at 15-16.

Hamdan argues that without video footage capturing this series of events, the Government has failed to meet its burden to prove the car failed to stop, of even if it did, that the Government failed to meet its burden to prove Mayberry or Leacraft saw this violation. *See* Docket 30 at 5; Docket 37 at 112. The court disagrees for two reasons. First, the Government need not submit video footage of a traffic violation so long as an officer credibly testifies that he observed such violation. *See United States v. Mendoza*, 677 F.3d 822, 827-28 (8th Cir. 2012) (finding officers' credible testimony, without mentioning video footage, sufficient to support reasonable suspicion). Second, although the court acknowledges the sky was dark outside due to it being after midnight, *see generally* Exhibit 1, other evidence supports Mayberry's and Leacraft's testimony that they observed the traffic violation. At the suppression hearing, Hamdan entered an aerial view of the distance between where Mayberry and Leacraft were stationed and where the Taurus pulled out of the gas station parking lot. *See* Docket 35 at 9; Docket 37 at 75-76. Based on the map, the detectives were less than a block away from the Taurus, with no obvious impediments that would have blocked their view. *See* Docket 35 at 9. Thus, the court credits the officers' testimony that saw the Taurus fail to stop before entering the car. The court finds Mayberry and Leacraft had reasonable suspicion and probable cause to believe the driver of the Taurus violated a

traffic law, so they could permissibly initiate a traffic stop. The court overrules Hamdan's objection to the invalidity of their initial stop.

### 2. Prolong

Having determined that Mayberry and Leacraft permissibly stopped the Taurus, the court next turns to whether they impermissibly "seized" Hamdan by prolonging the stop. "A seizure justified only by a police-observed traffic violation ... 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015) (second and third alterations in original) (citations omitted). But if officers develop reasonable suspicion of criminal activity during the permissible scope of a traffic stop, officers may briefly extend the stop to investigate such criminal activity. *See United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021); *see also United States v. Austin*, 104 F.4th 695, 699 (8th Cir. June 17, 2024) (reasonable suspicion of unrelated activity may prolong the stop). To determine reasonable suspicion, the court may not rely on information officers obtained only from unreasonably prolonging a stop. *See United States v. Betts*, 88 F.4th 769, 774 (8th Cir. 2023).

"Reasonable suspicion requires an officer to have 'a particularized and objective basis for suspecting legal wrongdoing based upon his own experience and specialized training.'" *United States v. Pacheco*, 996 F.3d 508, 511 (2021) (quoting *United States v. Jones*, 606 F.3d 964, 965-66 (8th Cir. 2010)). "Although the reasonable-suspicion standard requires more than 'a mere

hunch . . . the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.' " *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Determining whether officers have reasonable suspicion requires the court to consider the relevant circumstances based on the totality of circumstances and precludes the court from only looking at relevant factors in isolation by conducting a "divide-and-conquer" analysis. *See United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018).

As a threshold matter, the Report opined that although Leacraft had reasonable suspicion to conduct a *Terry* pat down of Hamdan, such a pat-down would improperly extend the stop because it would be done only to further officer safety. *See* Docket 40 at 24-25. Hamdan objects to the Report's finding of reasonable suspicion for a pat-down search but agrees with the Report's conclusion that the pat-down improperly prolonged the search. Docket 44 at 6. To be sure, *Rodriguez* explicitly prohibits officers from prolonging a traffic stop by attending only to safety precautions that are related to the traffic stop itself. *See Rodriguez*, 575 U.S. at 356 ("On-scene investigation into other crimes, however, detours from that mission. So too do safety precautions taken in order to facilitate such detours."). A *Terry* pat down is a safety precaution. *United States v. Stokes*, 62 F.4th 1104, 1108 (8th Cir. 2023) (explaining that "[o]nce a suspect is legally stopped, 'an officer who has reason to believe the detained individual may be armed and dangerous may conduct a pat-down

14

search for weapons *to ensure officer safety.*' " (emphasis added) (quoting *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006)). So if a reasonable officer extended the traffic stop solely to perform a *Terry* stop, such prolongment would violate the Fourth Amendment under *Rodriguez. See* 575 U.S. at 356. But the issue here is whether the stop is a pure traffic stop or one that extends to investigating another crime.

Here, Leacraft reasonably suspected that Hamdan was a felon because Leacraft knew Hamdan was on parole for a prior firearms offense. *See* Docket 37 at 60. Because Leacraft reasonably suspected Hamdan was a felon, so long as Leacraft reasonably suspected Hamdan was armed, Leacraft had reasonable suspicion that Hamdan was committing a federal offense. *See* 18 U.S.C. § 922(g)(1) (prohibiting possession of a firearm by an individual convicted of a felony). Thus, even if Mayberry failed to issue the driver, Ordonez-Saucedo, the traffic ticket in a reasonably diligent way and Mayberry's actions would have prolonged a pure traffic stop, the key inquiry is whether Leacraft reasonably suspected Hamdan was armed, because such suspicion would justify extending the stop beyond the original traffic stop's mission to investigate criminal activity. *See Callison*, 2 F.4th at 1132.

Starting with Hamdan's history, Leacraft testified that prior to pulling the Taurus over, he knew that Hamdan was on parole for a firearms offense, meaning that Hamdan has had a history of possessing firearms. *See* Docket 37 at 60-61. The court credits this testimony. This history is relevant for officers to consider because a reasonable officer could believe that a suspect would be

more likely to repeat their behavior than a suspect with no prior history. *See United States v. Hamilton*, 591 F.3d 1017, 1023-24 (8th Cir. 2010) (finding that officers' knowledge that defendant was on parole for child pornography supported officers had reasonable suspicion that defendant again possessed child pornography).

Hamdan argues that his criminal conviction was too old to consider because it was roughly three years old. *See* Docket 44 at 9; *see also* Docket 34 at 13 (showing Hamdan's release from prison to be April 2019). But even assuming Leacraft knew Hamdan's firearm conviction was old, the Eighth Circuit's decision in *Hamilton* forecloses Hamdan's argument. In *Hamilton*, the court still considered the officers' knowledge of the defendant's criminal conviction in determining whether officers had reasonable suspicion, even though such conviction was nearly ten years old.[6] *See Hamilton*, 591 F.3d at 1019, 1023-24. In fact, the defendant in *Hamilton* was still subject to parole for the underlying child pornography conviction. *See id.* Similarly here, the mere fact that Hamdan's conviction was three years old does not preclude officers

---

[6] The court in *Hamilton* does not clearly state whether officers knew the defendant's convictions were ten years old. *See Hamilton*, 591 F.3d at 1023 (stating only that the officers "knew that Hamilton had previous convictions related to child pornography received over the internet"). But such ambiguity does not change the analysis. If officers did in fact know the convictions were ten years old, then such knowledge did not pose a barrier in the officers reasonably considering it because the Eighth Circuit explicitly discussed the officers' knowledge of the defendant's previous convictions. *See id.* If officers did not know that the convictions were ten years old, then the officers' reliance is even more justified. Similarly here, the record is unclear whether Leacraft knew Hamdan's previous firearm conviction was three years old. But just like *Hamilton*, this ambiguity does not change the court's analysis.

from considering such fact, because three years is considerably shorter than the nearly ten-year old reliance in *Hamilton*. Additionally, just like the defendant in *Hamilton*, Hamdan was still on parole for the firearm violation (which Leacraft knew) by the time Leacraft encountered him. *See* Docket 34 at 13; Docket 37 at 60-61. Thus, the court rejects Hamdan's argument that officers may not consider Hamdan's criminal history.

In addition to Hamdan's criminal history, Leacraft also testified—which the court credits—that he knew Hamdan was a person of interest in a shooting approximately six months prior to the stop and had seen a picture of Hamdan at the shooting matching the description of the person seen carrying a gun in the area where the shooting took place. *See* Docket 37 at 60, 81; *see United States v. Johnson*, 31 F.4th 618, 621-22 (8th Cir. 2022) (findings that officers' knowledge that defendant was a person of interest in homicide investigation nearly two years before *Terry* stop supported reasonable suspicion that defendant was engaging in criminal activity); *United States v. Preston*, 685 F.3d 685, 690 (8th Cir. 2012) (considering defendant's previous encounters three years prior to the stop as relevant when officer knew that defendant's girlfriend had an order for protection against him and that defendant's name had been mentioned around the time of the stop at officer safety briefings).

Hamdan argues that the court should not rely on this piece of information for several reasons. First, Hamdan argues that the court should not consider Leacraft's knowledge that Hamdan was a person of interest in a shooting six months before the traffic stop because Hamdan did not have a

17

warrant, did not have a "Be on the Lookout" (BOLO) request out, and was not even named in the police report regarding this shooting. *See* Docket 44 at 8-9. Regarding the lack of warrant and BOLO request, at the time Leacraft ordered Hamdan out of the vehicle, Leacraft had not yet heard back from dispatch regarding whether Hamdan had any outstanding warrants or BOLO requests. *See* Exhibit 3 at 10:38 (showing Leacraft performs pat-down of Hamdan at approximately 12:37:47), 11:55 (showing dispatch radioed in results at approximately 12:39:02). Thus, for purposes of Leacraft's actions, the lack of warrant or BOLO request is immaterial to Leacraft's reasonable suspicion.

Regarding Leacraft's belief that Hamdan was a person of interest, the court acknowledges Leacraft's testimony that Hamdan was not actually named in the police report for the shooting that occurred six months ago. *See* Docket 37 at 82-83. While Hamdan's absence in the police report is notable, Leacraft did not appear to know of such absence at the time he ordered Hamdan out of the car and so relied on officers' internal dialogue. *See id.* (showing Leacraft had to refresh his memory regarding whether Hamdan was in the police report). While some internal dialogue could theoretically be so lacking in reasonability or reliability that an officer could not reasonably rely on it, Leacraft knew Hamdan was on parole for a firearms offense and so reasonably relied on Hamdan being a person of interest in a shooting six months ago, even if Hamdan was not actually named in a police report. Furthermore, Leacraft testified that he had seen a picture of Hamdan at the shooting and that this

18

picture matched the description of someone carrying a gun in the area at that time. *Id.* at 81.

Second, Hamdan argues the court should not credit Leacraft's reliance on observing a photo of an individual at the six-month old shooting who Leacraft believed to be Hamdan because Leacraft admitted he had never met Hamdan face to face. *See* Docket 44 at 9; Docket 37 at 81. But an officer need not meet someone face to face to reasonably believe the individual matches a description—or in this case, a photo—of a person of interest. *See, e.g., United States v. Smith*, 76 F.4th 1134, 1136-37 (8th Cir. 2023) (finding officers reasonably relied on photo and description of suspect and explaining that reasonable suspicion does not require perfection).

Third, Hamdan argues that even if Hamdan was a person of interest for a shooting that occurred six months prior to the traffic stop, the fact that six months had passed makes the information stale. *See* Docket 44 at 9-10. In addressing this point, because the Report relied on *Preston*, Hamdan argues his case is distinguishable from *Preston*. *See id.*; Docket 40 at 18-19. In *Preston*, the officers not only knew of the defendant's three-year old incidents involving firearms, but also knew of the defendant's current protection order and knew the defendant's name had been mentioned in officer safety briefings around the time of the stop. *See Preston*, 685 F.3d at 690. But as Hamdan correctly notes, in this instant case, Leacraft did not have any contemporaneous information about Hamdan (like a protection order or being mentioned in recent officer safety meetings), other than the six-month report.

19

The court agrees that Leacraft's situation differs from *Preston* in material ways. But "[t]here is no bright line test for determining when information is stale." *United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008). Acknowledging the six-month gap, the court weighs this factor less so than had Leacraft had more contemporaneous information about Hamdan, but nevertheless finds it still supports reasonable suspicion. *See United States v. Scott*, 818 F.3d 424, 431 (8th Cir. 2016) (concluding four- and twelve-year-old convictions "were not too remote in time to contribute to the officers' reasonable suspicion that [defendant] was armed and dangerous" but still "recogniz[ing] that the age of [defendant's] convictions is a factor to consider in determining their relevance"). The court overrules Hamdan's staleness objection, and all objections related to the six-month, person of interest factor.

In addition to knowing about Leacraft's criminal history and potential connection to a six-month old shooting, Leacraft also knew of Hamdan's association with a gang, the Gangster Disciples, and that a passenger, Abdulkadir was also associated with the Gangster Disciples. *See* Docket 37 at 66-67; *United States v. Roelandt*, 827 F.3d 746, 748-49 (8th Cir. 2016) (gang affiliation can support reasonable suspicion that defendant possessed firearm). Hamdan makes two related objections on this point. First, Hamdan objects to the court finding that Hamdan was involved with the Gangster Disciples at the time of the stop and that "[n]o evidence supports a broader affiliation of [Hamdan] with any gang outside a prison institutional setting." *See* Docket 44 at 13. Second, Hamdan objects to the court considering Hamdan's connection

20

with the gang, arguing that Leacraft's knowledge of gang affiliation is limited to when Hamdan and Abdulkadir were in prison, and that Leacraft did not provide a time frame for when Hamdan or Abdulkadir were allegedly involved in a gang nor did Leacraft testify that he saw them involved in gang activity after prison. *See id.* at 8. Because both objections center on the same arguments, the court addresses both objections at the same time.

While the court recognizes Leacraft testified that some of the pictures he saw of Hamdan and Abdulkadir using Gangster Disciples signs were ones of them in prison, Leacraft also testified that he saw Hamdan representing Gangster Disciples in a music video outside of the prison context. *See* Docket 37 at 100. Additionally, Leacraft testified that Hamdan has tattoos that indicate gang involvement. *See id.* at 101. The court credits this testimony and finds that Leacraft reasonably believed Hamdan was still affiliated with the Gangster Disciples. While gang involvement is not enough, standing on its own, to justify reasonable suspicion, the court finds it to be a relevant consideration here and overrules Hamdan's objections to the contrary.

Another factor supporting reasonable suspicion is that Leacraft knew the gas station where the Taurus initially left was "known for narcotics activity, different gun violations, and . . .  also gang activity in and out of there." Docket 37 at 58; *see United States v. Redman*, 39 F.4th 1030, 1033 (8th Cir. 2022) (considering high crime area as supportive of reasonable suspicion). The Report concluded that the gas station was a "high-crime gas station" and sometimes

the "subject of a gang turf war." Docket 40 at 17-18. The Report also concluded that the gas station was located in a high crime area generally. *See id.*

According to Hamdan, the Report erred in reaching its conclusions for several reasons. First, Hamdan argues that the basis of Leacraft's conclusions— characterizing the gas station as being in a high crime area and knowing of illegal activity there—is insufficient because, according to Hamdan, Leacraft has only seen one instance of an individual allegedly possessing a firearm in that location, and Leacraft did not testify whether such possession was even unlawful. *See* Docket 44 at 7-8. But Leacraft did not simply testify about one instance. Instead, Leacraft testified that he has "gotten in foot pursuits with other people with firearms out of [the] gas station." Docket 37 at 94. Leacraft also testified that he has seen narcotics activity at the gas station too. *Id.* Additionally, Leacraft testified that he has seen gang members that he knows personally at the gas station at night. *See id.* Because the court credits this testimony, the court overrules Hamdan's objection that the basis for Leacraft's belief that the gas station was known for narcotics, gun violations, and gang activity is insufficient.

At the same time, the court agrees with Hamdan that Leacraft's testimony was insufficient to establish that the broader area where the gas station is located is a high crime area. Although Leacraft in one instance testified that the broader area is known for narcotics, guns, and gangs, Leacraft at other times carefully limited his testimony to the "specific" gas station from which he saw the Taurus exit. *See* Docket 37 at 73-74, 94.

22

Because Leacraft's testimony is at best ambiguous, the government has not met its burden in proving that the overall area is a high crime area. Thus, the court sustains Hamdan's factual objection to the extent the Report concluded the broader area surrounding the gas station was a high crime area.

Second, Hamdan argues that the Report's conclusion that the gas station was sometimes "the subject of a gang turf war" and the Report's reliance on this fact supporting reasonable suspicion is erroneous because there is no evidence that the Gangster Disciples—the gang with which Hamdan was allegedly affiliated—was involved in any feud. *See id.* at 7-8. Hamdan acknowledges Leacraft testified that a couple of gangs in town feuded over the gas station in 2020, but argues that any alleged feuds do not support reasonable suspicion because they occurred years before the stop. *See id.*; *see also* Docket 37 at 94. The court agrees with Hamdan that the lack of specific connection between the Gangster Disciples and the feuds at the gas station, and the fact that Leacraft's testimony regarding the feuds appears to be limited to 2020, both cut against a finding of reasonable suspicion. But the court still finds Leacraft's reliance on knowing the gas station has had gang feuds in the past is reasonable in supporting reasonable suspicion.

Third, Hamdan argues that Leacraft "did not notice the indicia of any illegal activity associated with Mr. Hamdan's vehicle at the gas station." Docket 44 at 7. Other than the minor traffic infraction, the court agrees with this argument and agrees that Leacraft's lack of observing the Taurus engage with any activity dealing with firearms, drugs, or gangs weighs against finding

reasonable suspicion. But while relevant, Hamdan's observation does not directly undermine Leacraft's testimony that the gas station is generally "known for narcotics activity, different gun violations, and . . . also gang activity in and out of there." Docket 37 at 58. So Leacraft's belief about the gas station generally is still a relevant factor to consider when evaluating the totality of circumstances.

In summary, the court overrules in part and sustains in part Hamdan's objections regarding the location and nature of the gas station. The court credits Leacraft's testimony that the specific gas station from which the Taurus attempted to exit was known for narcotics, guns, and gang activity, and holds such testimony weighs in support of finding reasonable suspicion. *See* Docket 37 at 58. But the court acknowledges the lack of evidence regarding the Gangster Disciples' specific connection to this gas station. The court also acknowledges Leacraft did not observe Hamdan—or anyone else in the Taurus—act suspiciously or commit any illegal activity other than the minor traffic infraction. Nevertheless, the fact that the Taurus was in the parking lot of a gas station known to have at least some criminal activity still supports reasonable suspicion, even if it is likely insufficient on its own. *See United States v. McMillion*, 101 F.4th 573, 576 (8th Cir. 2024) (noting a factor that can support reasonable suspicion is "whether the suspect parties are 'located in a high-crime area' or an area where crimes have recently been committed" (quoting *United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015)).

24

The fact that Mayberry and Leacraft initiated the traffic stop after midnight and that it was dark out also supports Leacraft's suspicion. *See* Docket 37 at 59; *See generally* Exhibit 3; *United States v. Oliver*, 550 F.3d 734, 738-39 (8th Cir. 2008) (traffic stop conducted late at night supported reasonable suspicion that defendant was armed and dangerous). Hamdan objects to considering this factor, arguing that "driving around at 1:00 a.m. is not necessarily an indication that a person is involved in illegal activity, and that there are perfectly lawful reasons to do so." *See* Docket 44 at 6-7. While the court agrees that driving after midnight is not *per se* illegal, "reasonable suspicion 'need not rule out the possibility of innocent conduct.' " *Naverette v. California*, 572 U.S. 393, 403 (2014) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). And although driving late at night alone would be insufficient to justify reasonable suspicion, the Eighth Circuit has routinely considered the time of day when determining whether officers had reasonable suspicion of criminal activity. *See, e.g.*, *United States v. Daniel*, 887 F.3d 350, 354-55 (8th Cir. 2018). The court overrules Hamdan's objection on this point.

Additionally, when Leacraft approached the back passenger seat, Leacraft noticed Abdulkadir, an individual whom Leacraft knew was on parole for a violent offense and also had a firearm history. *See* Docket 37 at 63; Exhibit 3 at 4:00-4:15. Leacraft also recalled a previous interaction with Abdulkadir, in which approximately a year before the stop, Leacraft engaged in a foot pursuit of Abdulkadir after Abdulkadir ran from a traffic stop. *See* Docket 37 at 63; *see also* Exhibit 3 at 4:00-4:15. During that chase,

Abdulkadir threw a firearm. *See* Docket 37 at 63. To be sure, mere proximity to a known individual with a violent felony and firearm history, without more, is insufficient to establish reasonable suspicion. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). But such proximity is still relevant to consider, especially because Hamdan and Abdulkadir were in the same car headed to the same location with the same plans. *See United States v. Tucker*, 821 Fed. Appx. 659, 661 (8th Cir. 2020) (considering defendant's association with known drug dealer who had just completed crack-cocaine sale and whose associates were often armed to support reasonable suspicion that defendant was armed); Exhibit 3 at 2:24-2:58 (Hamdan explaining that the passengers were planning on going downtown "together"); Exhibit 2 at 1:40-1:51 (Ordonez-Saucedo explaining that "we" were thinking about maybe heading downtown). The court finds this factor supports reasonable suspicion, but affords it less weight than others because generally, hanging out with an individual with a history of violent felonies is not *per se* a crime.

The court acknowledges this case is close. Notably, Leacraft did not testify that Hamdan—or any of the other passengers—were acting nervously. In fact, Leacraft's body camera footage shows that in the time leading up to the stop, all of the passengers, including Hamdan, were acting normally and were cooperative throughout the entire interaction. *See generally* Exhibit 3 at 1:05-10:31. Additionally, neither Leacraft nor Mayberry had any contemporaneous information (such as a 911 caller or other observation) that Hamdan possessed a gun in that specific moment. But no single factor is dispositive and the court

26

must consider reasonable suspicion based on the totality of circumstances. *See Collins*, 883 F.3d at 1032. Weighing all of the circumstances and factors together, the court finds that a reasonable officer could suspect that Hamdan was a felon and possessed a gun. Thus, the court finds Leacraft had reasonable suspicion to extend the traffic stop,[7] *see Callison*, 2 F.4th at 1132, and so did not violate Hamdan's Fourth Amendment rights when he pulled Hamdan out of the vehicle.

## CONCLUSION

Based on the foregoing, it is ORDERED:

1) That the Report and Recommendation (Docket 40) is adopted as modified.

2) That Hamdan's objections (Docket 44) to the Report and Recommendation are granted in part and overruled in part. Specifically, the court sustains Hamdan's factual objection regarding whether the Tru Value Center gas station was in a high crime area and finds that the testimony does not support such an assertion. But all other objections, both factual and legal, are overruled.

---

[7] For this reason, the court overrules all of Hamdan's remaining objections regarding whether Mayberry or Leacraft delayed the traffic stop because such objections are moot. *See* Docket 44 at 14; Docket 58 at 3-6. Similarly, because the court finds the officers did not violate Hamdan's Fourth Amendment rights, the court need not address whether the exclusionary rule applies, so the court overrules Hamdan's objections on this issue as moot. *See* Docket 44 at 3-5; Docket 53; Docket 58 at 7-9.

3)  And that Hamdan's motion to suppress (Docket 29) is denied.

Dated July 10, 2024.

BY THE COURT:

*/s/ Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE